### NEW YORK & CUBA MAIL S. S. CO. v. SALVESEN.

### SALVESEN v. NEW YORK & CUBA MAIL S. S. CO.

(District Court, S. D. New York. August 23, 1923.)

Shipping ⊕═49(3)—Time charterer held chargeable with hire during negotiation for modification of charter.

A time charterer, which, during the charter period, desiring to use the vessel for a voyage prohibited without the owner's consent, negotiated for such consent, meantime holding the vessel for such voyage, *held* not entitled to deduct from the charterer hire for the time so lost.

In Admiralty. Suit by A. Salvesen against the New York & Cuba Mail Steamship Company, with cross-libel. Decree for libelant, less amount allowed on cross-libel.

Haight, Smith, Griffin & Deming, of New York City (Clarence Bishop Smith, of New York City, of counsel), for libelant and cross-respondent.

Burlingham, Veeder, Masten & Fearey, of New York City (Carl G. Stearns, of New York City, of counsel), for respondent and cross-libelant.

GODDARD, District Judge. These are cross-libels in rem. The facts, except in so far as they may be admitted by the pleadings, are covered by a stipulation, and it thus appears that the libelant and respondent on November 14, 1916, entered into a charter party whereby the libelant, as the owner of the steamship Thorgerd, chartered the ship for a period of 9 months and 3 weeks, to be employed in lawful trades between ports of the United States, West Indies, Central America, Caribbean Sea, Gulf of Mexico, South America, etc., excluding trading with belligerent countries without owner's consent.

The Thorgerd was delivered to the respondent under said charter on February 2, 1917.

On April 6, 1917, the United States became a belligerent in the European War. The Thorgerd was at this time under subcharter to the American Metal Company, Limited, and was proceeding to Guaycan, Chile, with a cargo of coke. After the completion of the

⊕═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

subcharter, she was to go under subcharter to W. R. Grace & Co. for a voyage from a nitrate port in Chile to the United States. After the entry of the United States into the war, the proposed voyage was outside of the charter limits. The charterer, however, desiring to make the voyage to the United States, entered into negotiations with the owner for the purpose of having the United States included within the charter limits. A series of telegrams were exchanged between the charterer and the owner and the agents, and finally the owner consented to this upon the charterer agreeing to increase the rate from 35 to 45 shillings per ton and to arrange for additional insurance.

The charterer claimed that the master lost 3 days in proceeding to enter on the voyage under the subcharter to Grace & Co., and deducted the hire for these 3 days, and the value of the coal consumed during that time, from the payments made to the owner. The owner seeks to recover this amount.

In the cross-libel, the charterer seeks to recover for some 168 tons of coal left in the Thorgerd bunkers at the time of her redelivery to the owner on November 12, 1917. The owner admits that under the charter the charterer is entitled to a credit of this 168 tons of coal at the market price, so the only question to be determined in the cross-bill is the market value of the coal at that time. It seems unnecessary to set out in detail the telegrams and cables that were exchanged, particularly as they are set forth in the agreed statement of facts.

To me it appears clear that the entry of the United States into the war was not one of those events which terminated the charter as set forth in article 16 of the charter, and moreover is one that is mutually excepted under section 17 of the charter. Therefore the charterer was bound to pay for the hire of the ship until November 12, 1917, when the charter terminated. Of course, the charterer had the right, when the United States became a belligerent, to negotiate with the owner in an effort to have the limit removed, so that it could send the ship to the United States; but the fact that its negotiations with the owner were successful or unsuccessful did not relieve it from paying the hire of the ship. The only effect these negotiations would have on the original charter would be that, if it (the charterer) were successful, it would obtain the right to send the ship to the United States and pay the increased rate from that time forward. The time consumed in these negotiations was chargeable to the charterer. The charterer had a right to use the ship, provided it did not depart from the terms of the charter. The charterer had no right, however, even to start the ship on a voyage to the United States until the owner and it had agreed upon it. So that the important point to determine is when this meeting of minds occurred.

The owner, by cable sent May 11th and received by his agent May 14th, replied to this one of a series of cables, as follows:

"Thorgerd Norwegian war insurance covers presently 2,300,000 kroners 2% pro anno balance covered 5% for three months charterers must allow owners cover insurance best possible. If this understood, instruct captain proceed present voyage charterparts [charterparty] limit must be maintained."

In this cable the owner informed charterer that part of the insurance was placed at 2 per cent., evidently a satisfactory rate, and the balance, 1,700,000 kroners, for three months, at 5 per cent., and absolutely insisted on the right to place the future insurance himself, and said that, if this was understood, the captain could proceed on the present voyage. On the same day (May 14th) Houlder, Weir & Boyd, agents in New York, for the owner, at the request of charterer, replied:

"Thorgerd charterers agree your conditions. Must have opportunity in future placing insurance here balance one million seven hundred thousand kroners. When did present three months period commence. Cabling captain proceed."

It will thus be seen that the charterer again qualified the acceptance of the terms on which the owner had insisted. The owner had only agreed to the modification of the charter party if charterer allowed the owner to cover insurance. The charterer now replied that it agreed, but must have opportunity in the future of placing insurance here to the extent of Kr. 1,700,000 (the amount which owner had placed at the 5 per cent. rate). This placing of insurance would take place as soon as the 3 months' period of 5 per cent. insurance came to an end, and the charterer inquired when this was.

Nevertheless, as appears from the conclusion of the cable, the owner's agent cabled the captain to proceed, thinking, no doubt, that an agreement would be reached. Houlder, Weir & Boyd had, of course, no authority, except such as was given by owner's cables and were taking a risk in doing this. The Margaretha, 167 Fed. 794, 93 C. C. A. 184. On the next day, May 15th, the charter's agent reiterated the same qualification of acceptance, confirming owner's—

"conditions regarding insurance as proposed in cable, * * * but in the future the charterers must have the opportunity of placing this insurance here before the owner definitely commits himself in Norway."

Thus, through the 15th, the charterer had not yet met one important condition on which the owner insisted that the whole agreement should turn, namely, that referred to in the cable sent May 11th:

"Charterers must allow owners cover insurance best possible. If this understood, instruct," etc.

On May 16th the agreement was drawn up, and was signed by the charterer as owner's agent. In this agreement the charterer said nothing about placing the insurance in the United States, and apparently yielded that point. It may therefore be possible that no contract was reached between the parties until this agreement of May 16th was received by the owner abroad and assented to there; but it is absolutely certain that the minds of the parties never met until this agreement of May 16th was signed, that being the first time that the charterer omitted its insistence on the point that it must have the right to place insurance.

The charterer has deducted hire from May 12, 1917, at 6:30 p. m. to May 15, 1917, at 1 p. m. in the sum of $3,132.10; also the further sum of $535, said to be the value of the coal consumed by the charterer during the period of 2 days 18½ hours from May 12th at 6:30

p. m. to May 15th at 1 p. m., making a total deduction of $3,667.10, on the ground that during that time the vessel failed to do something that she should have done in proceeding under the subcharter of Grace & Co. to the United States. Just what she failed to do, which she was obliged to do, does not appear. An examination of the ship's log shows that, from the time she finished unloading on the evening of May 12th until 1 p. m. on May 15th, she was engaged in cleaning up the holds after the discharge of the cargo of coke, which was necessary before she could be loaded with the nitrates, and also in proceeding to Coquimbo preparatory to taking in bunkers. Moreover, since the minds of the parties did not meet until May 16, 1917, it is clear that there is no ground for any deduction on the part of the charterer, even though the ship was delayed in proceeding upon the voyage to the United States.

I find that the libelant is entitled to recover from the respondent the sum of $3,667.10, and that on the cross-libel the libelant is entitled to a credit for the market value at the time of the 168 tons of coal left in the bunkers when the ship was turned over to the owner. A decree may be entered accordingly and providing that the question of the market value of the 168 tons of coal be referred to a commissioner, unless this value can be agreed upon, which shall be deducted from the amount due the libelant, A. Salvesen.